IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

EQUITABLE RESOURCES, INC, DOMINION RESOURCES, INC., CONSOLIDATED NATURAL GAS COMPANY, THE PEOPLES NATURAL GAS COMPANY,

Defendants,

and

PENNSYLVANIA PUBLIC UTILITY COMMISSION and COMMONWEALTH OF PENNSYLVANIA (through its Attorney General)

Amicus Curiae.

07cv0490
**ELECTRONICALLY FILED**

**MEMORANDUM OPINION**
**GRANTING DEFENDANTS' MOTION TO DISMISS (DOC. NO. 18)**

Defendants are public utilities which operate under the authority and regulation of the Pennsylvania Public Utility Commission ("PUC"), pursuant to the Pennsylvania Public Utility Code (66 Pa.C.S. §§ 101-3351), who seek to dismiss the Complaint (doc. no. 1) of the Federal Trade Commission ("FTC"). The FTC in its Complaint requests preliminary injunctive relief to halt an intra-state acquisition of defendant Peoples Natural Gas Company ("Peoples Gas") by

defendant Equitable Resources Inc. ("Equitable Gas"), that was recently approved by the PUC,[1]

---

[1] The essential details of the transactions are not contested, and are adequately summarized in the PUC's Amicus Curiae Brief at 9-10, as follows:

> On March 31, 2006, Equitable Resources Inc. (Equitable), and The Peoples Natural Gas Company, d/b/a Dominion Peoples (Peoples) (collectively, the Companies), filed a Joint Application seeking the Commissioner's approval of the transfer of all stock and rights of The Peoples Natural Gas Company to Equitable Resources, Inc., and for the approval of the transfer of all stock of Hope Gas, Inc. dba Dominion Hope, to Equitable Resources, Inc.
>
> Equitable is a publicly held, Pennsylvania corporation formed in 1925 by the consolidation and merger of Equitable Gas Company and Monongahela Natural Gas Corporation with a corporate history dating to 1888. It is headquartered in Pittsburgh and is an integrated energy company, with an emphasis on Appalachian area natural gas supply activities including production and gathering and natural gas distribution and transmission. Equitable Gas is the operating utility division of Equitable. It provides natural gas service to approximately 257,000 customers in ten Pennsylvania counties, including the City of Pittsburgh, and to 13, 474 and 3,702 customers in West Virginia and Kentucky, respectively. The Pennsylvania PUC has jurisdiction over Equitable Gas pursuant to sections 102, 501 and 1102 of the Pennsylvania Public Utility Code. 66 Pa.C.S. §§ 102, 501 and 1102.
>
> Dominion Peoples, is a public utility corporation incorporated in Pennsylvania in 1885 that provides natural gas service to approximately 357,000 customers in 16 Pennsylvania counties. The Commission has jurisdiction over it pursuant to the Public Utility Code. *Id*. Dominion Hope is a natural gas public utility operating in West Virginia subject to the jurisdiction of the Public Service Commission of West Virginia. Dominion Peoples and Dominion Hope are direct, wholly-owned subsidiaries of The Consolidated Natural Gas Company, a holding company incorporated in Delaware. CNG is a direct, wholly-owned subsidiary of Dominion Resources, Inc., a holding company organized under the laws of the Commonwealth of Virginia.
>
> * * *
>
> Under the terms set forth in the Joint Application, Equitable would acquire Dominion Peoples and Dominion Hope in a stock transaction under which Dominion Peoples and Dominion Hope wold become direct, wholly-owned subsidiaries of Equitable. Under terms of the Stock Purchase Agreement, Equitable would acquire all of the outstanding capital stock of Dominion Peoples and Dominion Hope. The consideration for the stock acquisition is approximately $970 million, which the parties stated was determined by competitive bidding and arms-length negotiations. Once the

after substantial and extensive documentation, hearings, and fact findings by Administrative Law Judge John H. Corbett, Jr. (the "ALJ") and by the PUC's subsequent Opinion and Order of April 13, 2007, ruling that said transaction was in the public interest.

The FTC complains that the PUC's approval of the stock transfer and acquisition by Equitable Gas would have a detrimental effect on approximately 500 Pennsylvania customers (who currently have "gas-on-gas" distribution competition); while on the other hand, the PUC focused its decision on the public as a whole (more than 600,000 Pennsylvania customers that will be favorably impacted by the transaction). Pennsylvania has a unique situation in that in a few locales there are two (2) gas distribution systems. This "gas-on-gas" distribution competition herein permits approximately 500 industrial and commercial customers to negotiate substantially lower prices from the currently separate Equitable Gas and Peoples Gas. In evaluating and approving the transaction, the PUC found that the benefit of gas-on-gas distribution competition to these 500 customers caused increased prices to the other 600,000 plus customers (primarily retail customers), and in the exercise of the PUC's statutory authority after consideration of a host of statutory considerations, concluded that this limited, and solely intra-state, gas-on-gas distribution competition was inefficient, and that the elimination of said competition through the proposed transaction would produce greater overall efficiencies, eliminate costly duplication, and be in the public interest, including the interest of the 600,000 plus customers who would be impacted.

---

transaction is completed, Dominion Peoples would continue to exist as a Pennsylvania public utility corporation and remain subject to regulation by the PUC. It would adhere to its existing tariff until changed upon approval of the PUC.

This Court grants the Motion to Dismiss (doc no. 18)[2] because the PUC's approval of the transaction qualifies for state action immunity. See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97 (1980); Parker v. Brown, 317 U.S. 341 (1943). Further, the granting of the requested preliminary injunction would cause public harm by substantially delaying, and for all practical purposes barring, the implementation of the PUC's determination (PUC Opinion and Order, dated April 13, 2007) that the transaction is in the public interest.[3] Said proposed injunction thus would interfere and abrogate the statutory duty of the PUC to protect the interest of the public in Pennsylvania.

### A. General Assembly's Grant of General Authority to the PUC

Each of the defendants are public utilities within the Commonwealth of Pennsylvania and, as such, defendants are subject to the requirements of the Pennsylvania Public Utility Code (the "Code") (66 Pa.C.S. §§ 101- 3315), established by the General Assembly of the Commonwealth of Pennsylvania ("General Assembly"). The Commissioners of the PUC are appointed by the Governor, confirmed by the Pennsylvania Senate, and serve as full-time government officials. 66 Pa.C.S. § 301. In general, the General Assembly, by enacting the Code, granted a broad public mandate to the PUC to regulate public utilities across a broad spectrum of

---

[2] Motions to dismiss are the proper procedural means to analyze the issue of whether the enforcement of federal antitrust laws should yield to a state regulatory decision. See Yeager's Fuel, Inc. v. Pa. Power & Light Co., 22 F.3d 1260, 1265 (3d Cir. 1994); and FTC v. Hospital Bd. of Directors of Lee County, 38 F.3d 1184, 1187 (11th Cir. 1994).

[3] While the case is in the procedural posture of a motion to dismiss, this Court believes that it is informative to look ahead to the implications of the PUC's public interest determination on this Court's analysis of the fourth prong of the preliminary injunction standard, i.e., whether granting the preliminary injunction will further the public interest. See Rogers v. Corbett, 468 F.3d 188, 192-93 (3d Cir. 2006) ("A party seeking a preliminary injunction must show . . . the public interest favors such relief.").

activities, including safety standards, regulation of rates, competition, services and facilities, and the enforcement of the Code. 66 Pa.C.S. §§ 501, 1101-1102. In particular, the PUC is the state administrative agency specifically empowered by the General Assembly to regulate defendants in this case, and the PUC, in fact, has considered the joint application for approval of the merger of Equitable Gas and Peoples Gas, and has approved said merger in an 87 page Opinion and Order dated April 13, 2007.

Under this general and extensive authority, the PUC is expressly authorized by the General Assembly, pursuant to the Code, as follows:

- To grant certificates of public convenience, upon a determination by the PUC that said grant is necessary or proper for the service, accommodation, convenience or safety of the public. See 66 Pa.C.S. § 1103.

- To determine that rates are just and reasonable and in conformity with the PUC's regulations and orders. See 66 Pa.C.S. § 1301. This PUC authority includes regulation of rates for natural gas distribution service (see 66 Pa.C.S. § 2203(11)), and review and approval of gas supply costs for natural gas distribution customers. See 66 Pa.C.S. §§ 1307 (f), 1307(g), 1308, 1317, and 1318.

- To evaluate, and to approve or reject proposed acquisitions, or transfers of assets, or mergers of public utilities. See 66 Pa.C.S. § 1102.

### B. General Assembly's Grant of Specific Authority to the PUC to Make Determinations on Scope and Nature of Competition Through its Regulatory Authority

The determination of the permissible and appropriate scope and nature of competition among public utilities, based upon the public interest, is within the jurisdiction of the PUC, and its "exclusive direction." City of Pittsburgh v. West Penn Power Co., 993 F.Supp. 332, 338 n.13 (W.D.Pa. 1997), aff'd 147 F.3d 256 (3d Cir. 1998), citing Peoples Natural Gas Co. v. Pa. PUC, 554 A.2d 585, 592 (Pa. Cmwlth. 1989), and 66 Pa.C.S. § 501(b).

Historically there was a time in which the PUC encouraged "gas-on-gas" competition in the 1980s and 1990s. Later, end-users of natural gas (generally, large industrial consumers) were able to acquire natural gas from producers and transport the natural gas supply via the interstate natural gas distribution system. This process was accelerated by a Pennsylvania statute, entitled the "Natural Gas Choice and Competition Act" (66 Pa. C.S. §§ 2201-2212 (effective July 1, 1999)), permitting all customers (i.e., large industrial and commercial customers, as well as retail customers) to acquire natural gas from independent suppliers which would be transported by their local natural gas distribution company. See also 66 Pa.C.S. § § 2204(a)[4] and 2203(2).

As part of this new statutory scheme, the General Assembly mandated to the PUC the responsibility to evaluate, regulate, and make determinations relating to competition within the retail natural gas supply service market in the Commonwealth of Pennsylvania. See Ch. 22 of the Code, 66 Pa.C.S. § 2201-2212. And, as to proposed mergers under Chapter 11 of the Code, the General Assembly in the Natural Gas Choice and Competition Act in Chapter 22 directs the PUC to evaluate possible "anticompetitive or discriminatory" effects in the natural gas supply service market in its determination of whether to approve acquisitions, transfers of assets, or mergers of natural gas suppliers or natural gas distribution entities. 66 Pa.C.S. § 2210. (In

---

[4] In relevant part, Section 2204(a) provides:

> . . . [C]onsistent with this chapter, all retail gas customers of natural gas distribution companies . . . shall have the opportunity to purchase natural gas supply services from a natural gas supplier or their natural gas distribution company to the extent it offers such services. The choice of natural gas suppliers shall rest with the retail gas customer. The commission shall adopt orders, rules, regulations and policies as shall be necessary and appropriate to implement fully this chapter . . . .

particular, as applied to the case herein, the PUC since the passage of the National Gas Competition Act of 1999 consistently has determined that "gas-on-gas" distribution competition in overlapping service territories is "wasteful and a duplication of fixed distribution facilities." See PUC Opinion and Order of April 13, 2007 at 56.) Section 2210 of the Code further grants the PUC authority to reject any acquisition, transfer of assets, or merger upon a finding of discriminatory or anti-competitive effects. 66 Pa.C.S. § 2210(b).

### C. General Assembly's Grant of Specific Authority to the PUC to Evaluate and Approve or Reject Proposed Acquisitions and Mergers

As discussed above, pursuant to a detailed and comprehensive statutory scheme established by the General Assembly, and implementing the policy positions of the General Assembly, the PUC is specifically charged to evaluate and investigate any proposed acquisition or merger to ensure that it is in the interest of the public and is not discriminatory or anti-competitive. To that end, Pennsylvania public utilities must file an application for PUC approval in the form of a certificate of public convenience, 66 Pa.C.S. § 1102, for any such merger or acquisition. City of York v. Pa PUC, 449 Pa. 136, 295 A.2d 825 (1972).

Following the statutory scheme for obtaining a certificate of public convenience, defendants filed an application for approval of the transaction, and the PUC evaluated and approved the transaction, as being in the public interest, pursuant to its authority under Section 1102 of the Pennsylvania Public Utility Code. See 66 Pa.C.S. §§ 1101-1104 (authority of the PUC to evaluate the nature and extent of competition among public utilities).

The express grant of statutory authority by the General Assembly to the PUC is set forth in Chapter 11 of the Code, which, in most relevant part, states as follows:

> (a) General Rule - Upon the application fo any public utility and the approval of such application by the commission, evidenced by a certificate of public convenience first had and obtained, and upon compliance with existing laws, it shall be lawful:
>
> * * *
>
> (3) For any public utility or an affiliated interest of the public utility . . . to acquire from, or transfer to, any person or corporation, . . . , by any method or device whatsoever, including the sale or transfer of stock, and including a consolidation or merger, sale or lease, the title to, or the possession or use of, any tangible or intangible property used or useful in the public service. . . .
>
> (4) For any public utility to acquire 5% or more of the voting capital stock of any corporation.

66 Pa.C.S. § 1102(a)(3) and (4).

In relationship to natural gas distribution companies specifically, the General Assembly through the Code provides that the PUC has authority to investigate and approve mergers and acquisitions of the assets of natural gas distribution companies. See 66 Pa.C.S. § 2210.

The statutory mechanism followed by defendants herein was to seek approval from the PUC, via a certificate of public convenience procedure. 66 Pa.C.S. § 1103(a); City of York, 449 Pa. at 140-41. In the Joint Application, Equitable sought approval to acquire the stock of Dominion Peoples and Dominion Hope, and Dominion Peoples and Equitable sought approval to transfer used and useful property by means of a stock purchase. Thereafter, there were public hearings and in excess of 500 pages of testimony and exhibits; Pennsylvania Office of Small Business, Pennsylvania Office of Consumer Advocate, consumers and interest groups, and many other interested parties were involved in the process; a Joint Petition for Settlement (which modified the Joint Application of defendants) was negotiated and agreed to by the PUC trial

staff, defendants, elected representatives, and others; briefing by those in favor and those opposing the Joint Petition for Settlement followed; a complete evidentiary hearing was held before an Administrative Law Judge who, in an 86 page Initial Decision, recommended to the PUC the approval of the Joint Application (as amended by the Joint Petition for Settlement) setting forth detailed findings of fact; and the transaction eventually was approved by the PUC in its Opinion and Order of April 13, 2007, after consideration of additional supporting and opposing papers.

### D. Review of PUC's Process and Analysis

This Court finds that the PUC's comprehensive approval/certificate of public convenience process (described above in a summary manner) was open, thorough, and substantial, and brought before the PUC all interested parties who developed a full record necessary for the PUC to make an informed and conscientious decision, as envisioned by the General Assembly to implement its policy of regulation in place of competition. The Court also finds that the PUC's analysis was quite substantive - - seeking to fulfill its statutory mandate from the General Assembly - - to protect important state interests and the interests of the citizens of the Commonwealth of Pennsylvania, by pervasive regulation designed by the General Assembly to trump free market competition among gas distributors.

The Commission fulfilled its responsibility to evaluate the proposed transaction and to determine that the transaction is in the interest of the public, provides substantial benefits to the various stakeholders, and is not likely to produce overall discriminatory or anti-competitive effects. See 66 Pa.C.S. §§ 2210(a) and 2210(b).

The PUC in regard to the anti-competitive issues, as stated earlier, determined that the elimination of gas-on-gas distribution competition is not anti-competitive under the factual record presented, finding that gas-on-gas distribution competition is not economical and less efficient than retail gas supply competition. See PUC Opinion and Order of April 13, 2007, at 53-54. The PUC analyzed the transaction's market impact on gas-on-gas competition on the distribution side separate from its impact on the retail supplier side, and in conjunction with a host of other public and private interests and considerations.

In consideration of the Motion to Dismiss, the Court need not review the "correctness" of each of the findings of fact of the ALJ/PUC, especially as to the dispute over the gas-on-gas distribution competition issue. The Court described the process and analysis in the above detail to demonstrate that the PUC approval process relating to the subject transaction was thorough and substantive - - pursuant to state mandated authority from the General Assembly of the Commonwealth of Pennsylvania, setting forth detailed and specific state policies and procedure, enacted by the elected officials of the people of the Commonwealth of Pennsylvania - - and in fulfillment of the PUC's responsibility to protect the public interest and further overall efficient, adequate non-discriminatory and competitive markets. And, importantly, after the consummation of the transaction, the PUC Order directs continued regulatory authority and oversight over defendants, and the PUC's statutory duty to protect the public interest will be on-going to prohibit discriminatory and anti-competitive conduct. 66 Pa.C.S. §§ 501, 1307-1309, 1317-1318, 2203.

**E. Standards of Review of the Motion to Dismiss**

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court accepts the well-pleaded factual allegations of the complaint as true, and draws all reasonable inferences therefrom in favor of the plaintiff. Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital, 185 F.3d 154, 155 (3d Cir. 1999). A claim should not be dismissed for failure to state a claim unless it appears beyond a doubt that the non-moving party can prove no set of facts in support of its allegations which would entitle it to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Marshall-Silver Construction Co. v. Mendel, 894 F.2d 593, 595 (3d Cir. 1990).

In making this determination, the court must construe the pleading in the light most favorable to the non-moving party. Budinsky v. Pennsylvania Dept. of Environmental Resources, 819 F.2d 418, 421 (3d Cir. 1987). As the United States Court of Appeals for the Third Circuit explained:

> A Rule 12(b)(6) motion will be granted "'if it appears to a certainty that no relief could be granted under any set of facts which could be proved.'" Evancho v. Fishe, 423 F.3d 347, 351 (3d Cir. 2005) (quoting D.P. Enter. Inc. v. Bucks County Cmty. Coll, 725 F.2d 943, 944 (3d Cir. 1984)). We must accept all factual allegations in [plaintiff's] complaint as true, but we are not compelled to accept "unsupported conclusions and unwarranted inferences," Schuylkill Energy Res., Inc. v. Pa. Power & Light Co, 113 F.3d 405, 417 (3d Cir. 1997), or "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986).

Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007).

**F. Application of the State Action Immunity Legal Test**

This case has brought before this Court excellent lawyers (and well-written briefs of the highest caliber) who generally agree on the legal standard, and the Court finds the application of

the legal standard to be rather straightforward. The two-part legal test is as follows: (1) does the Commonwealth of Pennsylvania have a clearly articulated and affirmative policy of regulation in place of competition?, and (2) does the Commonwealth of Pennsylvania actively supervise that policy? California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980). See also Parker v. Brown, 317 U.S. 341 (1943); A.D. Bedell Wholesale Co. v. Phillip Morris, Inc., 263 F.3d 239, 254 (3d Cir. 2001); Yeager's Fuel, 22 F.3d at 1265.

As stated in the Yeager's Fuel case, the United States Court of Appeals for the Third Circuit, 22 F.3d at 1265 (quoting from FTC v. Ticor Title Ins. Co., 504 U.S. 621, 633 (1992)), the state action immunity principle is "based upon the principle of freedom of action for the States, adopted to foster and preserve the federal system." Likewise, as discussed by the United States Court of Appeals for the Eleventh Circuit in the Lee County case, "the state action doctrine is intended to preserve the right of a state to provide for the well being of its citizens on a local level without being burdened by federal antitrust laws." 38 F.3d at 1191.

Chief Judge Scirica of the United States Court of Appeals for the Third Circuit explained the state action immunity as follows:

> To qualify as state action under the *Midcal* test, "the challenged restraint must be one 'clearly articulated and affirmatively expressed as state policy.'" 445 U.S. at 104, 100 S.Ct. 937 (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.)). A government entity need not "be able to point to a specific, detailed, legislative authorization" to assert a successful *Parker* defense. *Lafayette*, 435 U.S. at 415, 98 S.Ct. 1123. But it must be evident that under the "clear articulation" standard the challenged restraint is part of state policy. As the Supreme Court has stated, "*Midcal* confirms that while a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992).

A.D. Bedell, 263 F.3d 239, 259.

**G. Clearly Articulated Policy to Displace Competition**

The first prong of the test is satisfied in that the General Assembly has articulated and affirmatively expressed a state policy to displace competition with pervasive regulation. The PUC, a creature of the General Assembly of the Commonwealth of Pennsylvania, has been granted express authority, by detailed and specific Code provisions implementing the policies of the General Assembly, to evaluate and review transactions on a public interest standard. Quite frankly, it is hard to imagine a more thorough "articulation" of a state policy of regulation meant to take the place of free market competition than the overall comprehensive and pervasive governmental regulatory scheme set forth in the Code by the General Assembly of Pennsylvania.

The General Assembly did not simply give the PUC a blank check or a general grant of unfettered authority, with the PUC "writing" the regulations/ Code provisions -- on the contrary, the General Assembly wrote the "Code" and its policy determinations are explicitly set forth in the Code. It is true that, in considering whether to approve any "mergers or consolidations involving natural gas distribution companies or natural gas suppliers or the acquisition or disposition of assets or securities," the PUC must consider whether "the proposed merger, consolidation, acquisition or disposition is likely to result in anticompetitive or discriminatory conduct, including the unlawful exercise of market power, which will prevent retail gas customers from obtaining the benefits of a properly functioning and effectively competitive retail natural gas market." 66 Pa.C.S. § 2210(a)(1). However, the fact that the Code and the PUC regulatory scheme directs that the PUC evaluate potential anticompetitive consequences does not undercut the fact that the General Assembly has replaced free market competition with

regulation.

Additionally, Section 2210 charges the PUC with considering the "effect of the proposed merger, consolidation, acquisition or disposition on the employees of the natural gas distribution company and on any authorized collective bargaining agent representing those employees," 66 Pa.C.S. § 2210(a)(2), and other provisions of the Natural Gas Choice and Competition Act command the PUC to consider a wide range of other factors the General Assembly deemed important to its decisions, including "consumer protection" regarding residential billing practices; the integrity of the distribution systems and reliability of service, which comprises adequacy of supply ("taking into account peak and seasonal demands, as well as isolated market areas and system operation contingencies") and security ("designing, maintaining and operating a system so that it can safely handle extreme conditions as well as emergencies"); ensuring that low-income retail gas customers are able to afford natural gas service; and employee transition concerns and other employee related obligations (i.e., notices regarding lay offs and terminations). 66 Pa.C.S. §§ 2202 - 2207.

The PUC certainly considered the effect of the proposed elimination of gas-on-gas distribution competition in approving the Joint Petition for Settlement, but that was *only one* of the *many* statutory factors considered by the PUC; other factors considered and weighed included job creation and maintaining of the existing work force, the adequacy of the supply of gas if the proposal was approved, the operational practices of the companies involved, enhanced use of Pennsylvania gas, and synergistic cost savings. PUC Opinion and Order of April 13, 2007.

Following the General Assembly's regulatory scheme as mandated by the Code, the PUC ruled herein on an intra-state transaction, in which a few customers will lose the benefits of

current competition, but where the public as a whole will benefit, by not subsidizing said "competition," and by receiving the benefits of a more efficient gas distribution systems.[5]

FTC argues that "the public interest review of proposed utility mergers that the legislature has entrusted to the PUC is not in conflict with the policy of the federal antitrust laws." FTC Brief at 3. While this statement may be true on some theoretical level, the real world application herein is that the FTC is attempting to stop a transaction which the PUC has found to be in the overall public interest of the citizens of the Commonwealth of Pennsylvania.

The FTC also argues that the PUC is, in essence, "overrid[ing] the [state] legislative policy that anti-competitive natural gas utility mergers shall be prohibited." Id. If so, the remedy for any aggrieved party lies in an appeal to the very experienced and competent Commonwealth Court of Pennsylvania. See 66 Pa.C.S. §1103(a); ARIPPA v. Pa PUC, 792 A.2d 636 (Pa. Cmwlth. 2002) ("To appeal an agency adjudication, the person must have been a 'party' with the agency who is 'aggrieved' by the action and has a 'direct interest' in the subject matter of the proceeding. 2 Pa.C.S. §§ 702 and 752; 1 Pa.C.S. § 101. A party is aggrieved when adversely, directly, immediately and substantially affected by a judgement, decree or order. . . . An

---

[5]The FTC and possibly the Pennsylvania Attorney General seems to argue, in part, that the state action immunity does not apply if an approved-PUC transaction negatively impacts a limited number of customers. Every transaction has some "anti-competitive" aspects - - at least one customer is negatively impacted - - however, this does not transform the transaction into an "anti-competitive merger," assuming the overall impact is pro-competitive. Under the FTC's position, the state action immunity would never apply since there is always some negative impact in any transaction. However, PUC's state mandated duty is the focus on the overall public interest of a particular transaction. As the Pennsylvania Commonwealth Court stated in Middletown Twp. v. Pa PUC 482 A. 2d 674, 682 (1984), in reviewing the public interest standard: "[I]t is contemplated that the benefits and detriments of the acquisition be measured as they impact on all affected people, not merely on one particular group or geographic subdivision." (emphasis in original.)

association may have standing solely as the representative of its members and may initiate a cause of action if its members are suffering immediate or threatened injury as a result of the contested action."). See also Pa. R.A.P. 501 ("Except where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order . . . may appeal therefrom."); 2 Pa.C.S. § 702 (" Any person aggrieved by an adjudication of a Commonwealth agency who has a direct interest in such adjudication shall have the right to appeal therefrom . . . .") (Indeed, the newspapers reported on May 9, 2007, that an appeal already had been filed by the office of Small Business Advocate.)

**H. Continuing Regulation and Supervision by PUC**

The second prong of the state action immunity test also is satisfied. As stated above, the General Assembly has mandated appropriate and active supervision of the state policy; and, in this particular case, the PUC will actively supervise the transaction going forward, as an important part of the regulated public utility scheme established by the General Assembly of the Commonwealth of Pennsylvania. See 66 Pa.C.S. §§ 1301, 1302, 1307(f), 1308(d), 1309(a), 1317(c) & (d), 1218(a), (b) & (e), and § 2203 (1). See also Yeager's Fuel, Inc., 22 F.3d at 1270-72 ("purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties"; PUC's review of an electric utility's programs, which includes residential off-peak thermal heating rates and offering of cash grants to builders and developers, constituted active supervision since the PUC had to approve

the rates in tariffs that the electric utility must file under state law; more pointedly, since PUC had heard complaints about the RTS rate and responded to "inquiries from the legislature and protests by fossil fuel dealers" thus deciding that both programs served energy conservation and load management purposes); North Star Steel Texas, Inc. v. Entergy Gulf States, Inc., 33 F.Supp.2d 557, 565-567 (S.D.Tex. 1998) (active supervision was evident in Texas PUC's mandated duties in regulating electric utilities which included oversight of rates, services, accounting, and acquisition of energy efficiency programs; active supervision was also evident in the fact that utilities had to obtain approval from the PUC before providing any type of regulated service and the fact that PUC had conducted hearings recommending against proposals similar to the "wheeling and earmarking" power transference measures made by defendant); TEC Cogeneration Inc., v. Florida Power & Light Co., 76 F.3d 1560, 1570 (11th Cir. 1996) (noting that “active supervision requirement is designed to ensure that the state has ‘ultimate control’ over the private party's conduct, with the power to review and disapprove, if necessary, particular anticompetitive acts that may offend state policy,” and that mere fact that Florida Public Service Commission retains power to hear a complaint or act sua sponte to review utility’s conduct constitutes active supervision).

Again following the General Assembly’s regulatory scheme as mandated by the Code, the PUC explicitly retained ongoing oversight authority and control over the merged public utilities, and included conditions in its Order approving the proposed transaction. The terms and conditions of approval and the certificate of public convenience include that Equitable must file semiannual reports regarding its operational practices and modifications to its data interface system and the minutes of meetings of the “Universal Service Collaborative Group,” an annual

report regarding funding for community organizations and the Hardship Fund, a report notifying the PUC within 30 days of Equitable Gas's adoption of the gas accounting methodology and historical meter production methodologies of Peoples Gas, detailed periodic submissions explaining the impact of the elimination of any supply contract on Equitable Gas's projected gas costs, and identification in Equitable Gas's next base rate case of specific accounts into which entries have been made to record all Acquisition Premium and Transactions Costs transactions. See PUC Opinion and Order of April 13, 2007 at 85-86.

As the Court of Appeals for the Third Circuit stated in the Yeager's Fuel case, active state involvement is the "precondition for immunity from federal law," which requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. 22 F.3d at 1270, quoting Ticor, 504 U.S. at 634. It is obvious that the PUC is taking an active, hands-on approach to monitoring the transaction on an ongoing basis going forward, thus implementing the General Assembly's intended agency oversight over the completed transaction.

**CONCLUSION**

The General Assembly of the Commonwealth of Pennsylvania has clearly articulated, in the Code and the Natural Gas Choice and Competition Act, a policy to disfavor and displace free market competition in favor of a pervasive regulatory scheme, and has endowed the PUC with broad authority to implement its legislative prerogatives and policies, including requiring the PUC to issue certificates of approval for proposed mergers, consolidations, acquisitions or other dispositions of natural gas distribution companies. The General Assembly also has directed the PUC to take a very active role in supervising public utilities, including natural gas distribution

companies; and in this particular matter, the PUC explicitly retained jurisdiction to continue to actively monitor and review the approved merger transaction.

The federal antitrust laws are obviously important to the proper functioning of the free market system in this Nation, and so is the role of the FTC, which no doubt has acted zealously and in good faith to further its mandate to enforce those laws. However, the FTC must defer to the Pennsylvania General Assembly and the PUC which is implementing the Public Utility Code in this case, since the state action immunity doctrine insulates the PUC's approval of the merger between Equitable Gas and Peoples Gas from federal antitrust scrutiny, for the reasons stated above, consistent with the principles of federalism and precedents of the United States Supreme Court and the United States Court of Appeals for the Third Circuit. The FTC's complaint under antitrust laws against the private actors who have sought and received a certificate of public convenience from the PUC for their merger transaction, therefore, must be dismissed.

An appropriate order will be entered.

**SO ORDERED** this 14th day of May, 2007.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties